Dibrino v Rockefeller Ctr. N., Inc. (2025 NY Slip Op 07077)

Dibrino v Rockefeller Ctr. N., Inc.

2025 NY Slip Op 07077

Decided on December 18, 2025

Court of Appeals

Wilson, Ch. J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 18, 2025

No. 103 

[*1]Dominick Dibrino, et al., Respondents,
v
Rockefeller Center North, Inc., et al., Appellants, Turner Construction Company, Defendant, DAL Electrical Corporation, Respondent.

Sofya Uvaydov, for appellants. 
Christopher Simone, for respondent DAL Electrical Corporation.

WILSON, Chief Judge:

Dominick Dibrino, a carpenter employed by nonparty subcontractor Jacobson & Co., Inc. ("Jacobson"), was injured when he fell from a ladder owned by the electrical subcontractor DAL Electrical Corporation ("DAL") while working on a renovation project. The Appellate Division held that the subcontracting agreement between DAL and the project's general contractor, JRM Construction Management LLC ("JRM"), does not require DAL to indemnify JRM for damages arising from Mr. Dibrino's injury. We agree.
I.
In June 2019, Mr. Dibrino was working at 1271 Sixth Avenue on a renovation of office space for Major League Baseball's headquarters. Mr. Dibrino began his workday using a six-foot A-frame ladder and a rolling Baker scaffold, both provided by his employer, Jacobson, to take measurements and mark out a soffit in the fifth-floor pantry. After Mr. Dibrino finished that work, he moved the scaffold and ladder to a different floor for a separate afternoon task and proceeded to lunch.
During his lunch break, a fellow Jacobson employee instructed Mr. Dibrino to check his earlier measurements. Mr. Dibrino returned to the fifth-floor pantry with his foreperson to do so, but did not bring his Baker scaffold or ladder with him. Instead, Mr. Dibrino decided to use a different six-foot A-frame ladder that was in the pantry area. Mr. Dibrino knew the ladder did not belong to Jacobson, but did not request permission to use it or ask who owned it. The ladder turned out to be owned by DAL; it had a bent non-stepping rung and blue tape on the cap and top two rungs. A DAL foreperson stated that if he discovered a ladder was in disrepair, he would place blue painter's tape around it, write "do not use" on it, and dispose of it thereafter.
For about 15 minutes, Mr. Dibrino climbed up and down DAL's ladder, taking measurements without issue. He then climbed to the second or third rung of the ladder to begin measuring above his head. The ladder wobbled, and Mr. Dibrino's foot became stuck in one of the rungs as he fell. He landed on a pair of snips in his toolbelt, impaling his abdomen and causing serious injuries.
Mr. Dibrino commenced this action and asserted claims under Labor Law §§ 200, 240 (1) and 241 (6) against JRM, Rockefeller Center North Inc. ("Rockefeller") (the owner of the premises) and DAL [FN1]. He also asserted a claim for common-law negligence against DAL, arguing that DAL proximately caused his injuries by leaving an allegedly defective ladder in the pantry area. He asserted that the ladder had a bent non-stepping rung which caused his fall, a defect evidenced by the blue tape on the ladder. JRM and Rockefeller brought cross-claims against DAL for breach of contract, contractual indemnification, common-law indemnification and contribution. DAL sought dismissal of the complaint and all cross-claims (both contractual and common-law) against it.
Supreme Court granted Mr. Dibrino's motion for partial summary judgment on his Labor Law § 240 (1) claim and denied DAL's motion for summary judgment dismissing (1) Mr. Dibrino's Labor Law § 200 and common-law negligence claims and (2) JRM and Rockefeller's cross-claims against DAL (2022 NY Slip Op 34762[U] [N.Y. Sup Ct, Bronx County 2022]). Supreme Court also granted JRM and Rockefeller's cross-motions for summary judgment on their contractual indemnification cross-claim against DAL (id. at *5).
The Appellate Division, with two Justices dissenting, modified Supreme Court's order and otherwise affirmed (see 230 AD3d 127, 137 [1st Dept 2024]). The court modified Supreme Court's order by denying JRM and Rockefeller's cross-motion on their contractual indemnification claim against DAL (id.) and granting DAL's motion for summary judgment seeking dismissal of the remaining causes of action against it in the complaint and all cross-claims against DAL (id.). The court then granted JRM and Rockefeller leave to appeal and certified to this Court the question of whether its decision was properly made. During the pendency of this appeal, JRM and Rockefeller submitted a letter pursuant to Rule 500.6 informing this Court that they had reached a settlement agreement with Mr. Dibrino.[FN2]
[*2]II.
We agree with the Appellate Division that none of the several contractual indemnification provisions requires DAL to indemnify JRM or Rockefeller for Mr. Dibrino's injuries. The distantly attenuated nexus between DAL's performance of its work, as defined in the subcontracting agreement, and Mr. Dibrino's use of the ladder, renders those injuries beyond the scope of DAL's contractual indemnification obligations.
The fundamental rule of contract interpretation in New York is that "agreements are construed in accord with the parties' intent" (Greenfield v Philles Records, 98 NY2d 562, 569 [2002]). What the parties "say in their writing" provides us with "[t]he best evidence" of this intent (id., quoting Slamow v Del Col, 79 NY2d 1016, 1018 [1992]), and when a written contract is "complete, clear and unambiguous on its face," we must enforce its plain terms (id.). Determining whether a contract is ambiguous is a question of law (MAK Tech. Holdings Inc. v Anyvision Interactive Tech. Ltd., 42 NY3d 570, 572 [2024]).
JRM and Rockefeller argue that each of the three indemnity provisions in JRM's contract with DAL independently requires DAL to indemnify JRM for damages (1) arising from DAL's work or alleged to result from any negligence, violations of law, or claims of strict liability from DAL's work and (2) arising from, resulting from, and related to (directly or indirectly) DAL's acts and omissions. They contend that Mr. Dibrino's accident would not have happened if DAL had locked up or put away its ladder, and therefore the indemnity provisions require DAL to indemnify JRM and Rockefeller for Mr. Dibrino's damages.
All three indemnity provisions at issue are anchored by a common limitation. The first two indemnity provisions, Articles 6.10.6 and 10.1, set out the limitation most explicitly. Article 6.10.6 requires DAL to indemnify JRM and Rockefeller "for all Claims, damages, and the payment of all fines incurred . . . as a result of Subcontractor's performance of the Work related in any way to safety, heath, fire or environmental violations or deficiencies in the planning or execution of the Work for which Subcontractor is responsible under this Agreement and/or Purchase Order . . . ." (emphasis added). Article 10.1 similarly requires DAL to indemnify JRM and Rockefeller "from and against any claims, damages, losses, liabilities, fines, payments and expenses . . . arising out of and in connection with injuries (including death) or damage to property . . . resulting from performance of the Work" (emphasis added). That provision also holds DAL to a duty to indemnify JRM and Rockefeller for such claims "to the extent caused or alleged to be caused in whole or in part by a violation of any law, ordinance, or regulation or by any negligent or willful act or omission, or any claim of strict liability, arising out of Work by the Subcontractor or anyone directly or indirectly employed by Subcontractor or anyone for whose acts Subcontractor may be liable" (emphasis added). In both provisions, the baseline requirement before DAL's duty to indemnify arises is that the relevant claim must "result[] from," be a "result of" or "aris[e] out of" DAL's "performance" of its contractually defined "Work." As the dissent concedes, these two provisions require there to be some "nexus between a claim and DAL's agreed-upon work for Rockefeller and JRM" (dissenting op at 10).
Importantly, the contract cabins the meaning of the term "Work." Article 2.2.3 defines "Work" as "the scope of work to be performed on a Project by Subcontractor in accordance with the terms of this Agreement and the Contract Documents including changes thereto." The rest of the agreement accordingly gives depth to that definition: Article 3 sets out the scope of work, including details about the purchase order process and submissions of price for work; Article 4 sets out the schedule of work; Article 5 sets out the general contractor's obligations; and most specifically, Article 6 sets out the terms of DAL's performance, including the work schedule, DAL's obligations to furnish its supplies, inspection requirements, details about clean-up, and safety procedures. That detailed definition determines the scope of the indemnity: indemnifiable claims must arise from DAL's performance of its work, not from acts that bear an attenuated relationship to its work.
Mr. Dibrino's unauthorized use of an unattended ladder (which he knew was not furnished by his employer and knew he was not supposed to use) instead of using the scaffold and ladder supplied by Jacobson that he had used earlier that day in that same spot, to perform work squarely outside the scope of the agreement between DAL and JRM, is not reasonably construed as arising from performance DAL's [*3]work. JRM and Rockefeller's reading would mean DAL's contractual duty to indemnify would be triggered by any event that could be traced to DAL through any path—even, for example, had DAL disposed of the defective ladder in a dumpster and Mr. Dibrino retrieved it. Such an expansive reading of these indemnity provisions is implausibly broad, and as the dissent notes, an indemnification provision "must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed" (dissenting op at 8, quoting Hooper Assoc. v AGS Computers, 74 NY2d 487, 491 [1989]).
JRM and Rockefeller point to insurance cases, such as Worth Constr. Co. Inc. v. Admiral Ins. Co. (10 NY3d 411, 415 [2008]), where we have said that phrases such "arising out of" mean "originating from, incident to, or having connection with" and require only some "causal relationship" between the injury and the "risk for which coverage is provided" (id.). However, the cases cited by JRM and Rockefeller do not stand for the proposition they assert here. Putting aside that the contract here limits those terms by tying them to "performance of the Work," in insurance cases of the sort relied on by JRM and Rockefeller, it has been long established that "[i]n the presence of ambiguity we adhere to the construction adverse to the insurer" (Killian v Metro. Life Ins. Co., 251 NY 44, 48 [1929]). The baseline rule in the insurance context, if contractual language is ambiguous, is to construe in favor of coverage; no such background rule is applicable to indemnification agreements between contractors.
Finally, the third contractual indemnity provision, Article 12.2.1, does not colorably reach DAL's conduct here. Article 12.2.1 provides that DAL agreed to indemnify JRM (and other indemnitees) for:
" . . . any and all liabilities, claims, suits, demands, damages, judgments, costs, fines, penalties, interests and expenses . . . whenever asserted or occurring, which any Indemnitee may be charged or suffer, incur or pay out, or which may be asserted against any Indemnitee in whole or in part, and arising out of, resulting from or in any way related, directly or indirectly, to the following:
(a) any acts or omissions, breach of the terms, conditions, representations, warranties or obligations under this Agreement or failure to comply with the applicable Laws or the Contract Documents by the Subcontractor, its employees, or agents or any of its subcontractors, including, without limitation, (i) injuries to Contractor's or any Subcontractor's employees, agents or subcontractors and Claims resulting from injuries, property damage or loss of data caused by Subcontractor and . . . :
. . .
(c) Subcontractor's, or any of its respective agents' or employees', failure to perform obligations arising from its respective employment relationship with its employees, agents and subcontractors,
. . .
(g) the negligence or willful misconduct or negligent acts or omissions of Subcontractor, or their agents, contractors, subcontractors, servants or employees" (emphases added).
This provision lacks the explicit "performance of the Work" restriction found in Articles 6.10.6 and 10.1. JRM and Rockefeller contend that the difference in language renders Article 12.2.1's indemnity applicable to DAL's conduct in leaving its ladder unattended.
We disagree. By its terms, Article 12.2.1 (a) incorporates the rest of the agreement—including the other indemnity provisions—by restricting its scope to claims arising "under this Agreement." For example, a claim for damages that is "related . . . indirectly" to DAL's actions does not automatically trigger Article 12.2.1 (a) because such a claim must emerge "under th[e] Agreement." And "the Agreement" is defined with specificity in the contract: "this Master Subcontractor Agreement together with the exhibits, schedules and any written supplements hereto," meaning, the entirety of the agreement. Likewise, that same provision states that the indemnity will cover "failure to comply with . . . the Contract Documents by the [sub]Contractor"—which provides a further reference to DAL's scope of work. Moreover, nearly all the other sub-provisions of Article 12.2.1 include comparable scope-of-work constraints: subsection (c) applies to subcontractor's "failure to perform obligations arising from its respective employment relationship[s]"; subsection (d) applies to certain claims "under this Agreement"; subsection (e) applies to certain claims arising "by reason of the performance of the Work" or other specified claims "in connection with the Work"; and subsection (f) refers to contributions made payable under or in connection with respect to DAL employees "engaged in the Work to be performed and furnished under this Agreement."
Thus, although Article 12.2.1 brings additional claims within the sweep of claims that trigger DAL's contractual duty to indemnify—such as claims related indirectly to an act of DAL made pursuant its agreement—it does not go so far as to swallow the whole of the other indemnity provisions (or its own sub-provisions, for that matter). Indeed, JRM and Rockefeller's interpretation of Article 12.2.1 is so broad as to render the other contractual indemnification provisions superfluous. Unlike JRM and Rockefeller's reading, our interpretation of Article 12.2.1 harmonizes it with the rest of the contract language. "We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect" (Ronnen v. Ajax Elec. Motor Corp., 88 NY2d 582, 589 [1996]; see also Lawyers' Fund for Client Protection of State of N.Y. v Bank Leumi Tr. Co. of New York, 94 NY2d 398, 404 [2000] ["(U)nder standard principles of contract interpretation" we do not read contracts in a way that renders them or their subparts "superfluous"]). It is revealing that counsel for JRM and Rockefeller could articulate no circumstance which would be covered by either Articles 6.10.6 or 10.1 but escape the coverage of Article 12.2.1. Nor could counsel articulate, in light of that broad reading of Article 12.2.1, what purpose was served by subsection (g) of that provision, which explicitly covers negligent acts and omissions of DAL and its agent.
Emphasizing what they see as the remarkable breadth of Article 12.2.1's language, our dissenting colleagues claim that Article 12.2.1 dramatically expanded the scope of indemnification with respect to the other indemnity provisions in the master subcontractor agreement (dissenting op at 13-14). This is because the introduction to the addendum (where Article 12.2.1 is located) provides that the addendum "shall amend, add to, supplement, modify, and/or replace" provisions of the master subcontractor agreement and take precedence in the event of a conflict or variance of breadth between the two pieces of the contract (id.). They also claim that because Articles 6.10.6 and 10.1, along with some sub-provisions of Article 12.2.1, contain explicit scope-of-work triggers and other provisions do not, the parties therefore intended for Article 12.2.1 to do away with the other indemnity provisions' requirement of a nexus between Mr. Dibrino's claim and DAL's agreed-upon work for Rockefeller and JRM (id. at 11).
The dissent's view suffers from two core problems. For one, if the parties meant to extinguish the first two indemnity provisions in the master sub-contractor agreement as the dissent claims, they would have said so. By its terms, the broad introduction to the addendum does no such thing. That provision establishes that the addendum "shall amend, add to, supplement, modify, and/or replace" provisions of the master subcontractor agreement. Why the addendum "replaces" the earlier indemnity provisions rather than "amend, add to, supplement, [or] modify" them, as the addendum says it could, the dissent does not [*4]satisfactorily explain. Instead, they insist simply that in the event of a conflict, Article 12.2.1 "replaces" its analogous provision in the master subcontract agreement, but in the event that Article 12.2.1 "covers broader ground" than its sister provision (which, when construing a contract, one might also describe as a direct conflict), Article 12.2.1 merely "supplements" that provision (id. at 14). That distinction makes no difference, and in any event, JRM and Rockefeller's reliance on Articles 6.10.6 and 10.1 at all stages of this litigation indicates the parties did not view those provisions as rendered dead letter by Article 12.2.1.
More fundamentally, the dissent's capacious view of Article 12.2.1 leaves the scope of that provision unbounded. Anticipating the foreseeable objection, the dissent insists that its view of Article 12.2.1 is "not without limits" (id. at 11), claiming that "DAL would not be obligated to indemnify Rockefeller and JRM if its employee had safely closed and stored its ladder, and a non-DAL employee broke into DAL's storage, took DAL's ladder, and was injured while using it" (id. at 11-12). Why not? The dissent relies on its own handcrafted definition (notably pressed by neither party), whereby the meaning of work performed "under this Agreement" extends to anything that foreseeably might result from the presence of DAL and its equipment at the worksite, rather than work actually performed by DAL (id. at 12-13). We think the better reading is the latter, because it hews more closely to the contractual language instead of incorporating tort concepts of foreseeability into a question of contractual interpretation.
JRM and Rockefeller also assert that Article 12.2.1 (g) also entitles them to contractual indemnity from DAL. In their view, because the Appellate Division erred in determining that DAL did not assume a duty to Mr. Dibrino, and because Article 12.2.1 (g) indemnifies DAL and its agents for "negligence or willful misconduct or negligent acts or omissions," their cross-claims for contractual indemnification against DAL should survive even if we hold that the other indemnity provisions were not triggered. Acknowledging that Mr. Dibrino never entered into any contract with DAL, JRM and Rockefeller's theory is that, in leaving a ladder accessible to Mr. Dibrino, DAL launched a force or instrument of harm such that it assumed a duty of care to him. We are unpersuaded.
The core question is whether DAL owed a duty of care to Mr. Dibrino. Because there is no contract between Mr. Dibrino and DAL (or between DAL and Mr. Dibrino's employer, Jacobson), for JRM and Rockefeller to claim that DAL assumed a duty of care in tort to Mr. Dibrino, they must overcome the general rule that "a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party" (Espinal, 98 NY2d at 138; see also Eaves Brooks Costume Co., Inc. v Y.B.H. Realty Corp., 76 NY2d 220, 226 [1990] [similar]; Prosser and Keeton, Torts § 92, at 656 [5th ed] [same]). In Espinal v Melville Snow Contractors, we noted three circumstances in which a party performing a contract may owe a duty to a noncontracting party: (1) where the contracting party unreasonably launches a force or instrument of harm; (2) where a third party detrimentally relies on a contracting party's continued performance of its duties; and (3) where the contracting party has entirely displaced the another party's duty to maintain the premises safely (98 NY2d 136, 138 [2002]). The only exception claimed by JRM and Rockefeller is the first.
Our caselaw indicates the circumstances giving rise to this exception are narrow. In both Moch, where we coined the phrase "force or instrument of harm," and in Espinal, we held that the exception was not met (see H.R. Moch Co. v Rensselaer Water Co., 247 NY 160 [1928] [Cardozo, Ch. J.]). Likewise, in Church v Callanan Indus. (99 NY2d 104 [2002]), we refused to recognize a duty of a company engaged to install a highway guardrail to a passenger in a car that drove off the side of an embankment when the driver fell asleep (id. at 112). The other of our cases cited by JRM and Rockefeller similarly held that the contracting party assumed no duty of care to the noncontracting plaintiff (see Fung v Japan Airlines Co., Ltd., 9 NY3d 351, 361 [2007]; Stiver v Good & Fair Carting & Moving, Inc., 9 NY3d 253 [2007]). The parties cite to no case in which we held that a party met this "instrument or force of harm" exception.
Moch offers guidance for understanding just how to apply the "force or instrument of harm" exception. In determining whether a party's performance of a contractual duty has established a duty of care towards a noncontracting party, courts must determine whether the contracting party's performance has [*5]risen from the level of "mere negligent omission, unaccompanied by malice or other aggravating elements" up to the more severe threshold of active "commission of a wrong" (id. at 169). That analysis necessarily hinges on the action of the contracting party: "What we need to know is not so much the conduct to be avoided when the relation and its attendant duty are established as existing. What we need to know is the conduct that engenders the relation" (id. at 167). Other of our cases explain that, in determining the existence of a duty, the reasonable expectations of persons in the position of the injured third party should be taken into account (see, e.g., Palka v Servicemaster Mgt. Services Corp., 83 NY2d 579, 586 [1994] ["Not uncommonly, parties outside a contract are permitted to sue for tort damages arising out of negligently performed or omitted contractual duties]; see also Glanzer v Shepard, 233 NY 236 [1922]; MacPherson v Buick Motor Co., 217 NY 382 [1916]; Fish v Waverly Elec. Light & Power Co., 189 NY 336 [1907]; Hall v United Parcel Serv., 76 NY2d 27, 32 [1990]).
The facts here do not fit into the "force or instrument of harm" exception. The conduct engendering the relation between DAL and Mr. Dibrino is far too attenuated to establish a duty running from the former to the latter. Jacobson and DAL were independent contractors working on the same project, hired separately, with separate agreements and separate scopes of work. Each was to supply its own tools and materials for its jobs, and the record is unequivocal that subcontractors were forbidden from using the equipment or tools of others, though they sometimes did. In these circumstances, DAL's failure to remove a ladder, even if defective, is not sufficient to impose a duty in tort running from DAL to Mr. Dibrino. Leaving a defective ladder unattended is closer to "mere negligent omission" than to "commission of a wrong," and employees of subcontractors cannot reasonably rely on the safety and appropriateness of the equipment of others, particularly when their own employer has provided sufficient equipment and all employees are instructed to use only their own employer's equipment. Recognition of a duty in these circumstances is not appropriate.
The analytical framework set forth by JRM and Rockefeller is unworkable. Relying on Church, they argue that to have launched a force or instrument of harm, a defendant must merely "make a situation less safe than it would have otherwise been or place the plaintiff in a more vulnerable position than if the defendant had done nothing." That analysis confuses foreseeability with duty. The fact that DAL left a ladder at the worksite, or that DAL (potentially) knew that a ladder left open a worksite might be used by other contractors, or that a ladder with bent rungs would be unsafe, are all questions of foreseeability. Setting aside our longstanding rule that foreseeability does not establish a duty, but rather the scope of a duty once established (see Matter of New York City Asbestos Litig., 27 NY3d 765, 788 [2016]), if foreseeability of harm were the only metric used to establish whether a contracting party assumed a duty to a noncontracting third party, it would swallow the default rule of no duty to third parties to a contract. Moch would have reached an entirely different result: the inability to extinguish a fire because of low water pressure in Moch was easily foreseeable, as the Court noted (see 247 NY at 163). Instead, how far the duty extends is, as Moch makes clear, a combination of examining the nature of the conduct that engenders the relation and prudential factors concerning the scope of the liability.
Moreover, we have never established that when a party's performance of a contract increases a risk of harm—no matter how incremental the increase or minimal the risk—a duty of care flowing from a contracting party to a third party always follows. The language from Espinal and Church cited by JRM and Rockefeller—holding that when "a defendant who undertakes to render services and then negligently creates or exacerbates a dangerous condition may be liable for any resulting injury" (Espinal, 98 NY2d at 141-142)—indicates that an increased risk of harm is, of course, a necessary condition to impose a duty in tort, but is not determinative of the existence of a duty. If some increase in risk of harm were sufficient to overcome the general rule that a contractual obligation does not create a duty in tort running to third parties, Espinal, Church and Moch all would have reached different results. In Moch, the lack of sufficient water pressure increased the risk experienced by the plaintiff (and anyone else in the city at risk of a fire) (247 NY at 163). In Church, the company's failure to install a highway guardrail increased the risk experienced by [*6]every driver on the highway (99 NY2d at 112). Finally, in Espinal, even though snow plowing can leave "residual snow or ice" in the area plowed, and "that failure to sand and salt the area could possibly cause snow to melt and refreeze" (98 NY2d at 142), we held that the defendant simply "cleared the snow as required by the contract" and therefore, he "[could not] be said to have created or exacerbated a dangerous condition" (id.).
Because we determine that DAL assumed no duty of care to Mr. Dibrino under these circumstances, we hold that the Appellate Division properly determined that DAL was entitled to summary judgment dismissing JRM and Rockefeller's cross-claim for contractual indemnification under Article 12.2.1 (g) as well.
We have reviewed JRM and Rockefeller's remaining arguments and find them to be without merit.
Accordingly, the order of the Appellate Division insofar as appealed from should be affirmed, with costs, and the certified question answered in the affirmative.

RIVERA, J. (dissenting):

Subcontractor DAL Electrical Corporation (DAL) signed a contractual agreement that required it to indemnify Rockefeller Center North, Inc. (Rockefeller) and general contractor JRM Construction Management LLC (JRM) for all damages "in any way related, directly or indirectly" to any of DAL's "acts or omissions" under the agreement, including, "without limitation," those that cause injuries to any other subcontractor's employees. The plain language of this breathtakingly broad provision leaves no doubt that DAL was required to indemnify Rockefeller and JRM for the injuries that plaintiff Dominick DiBrino, an employee of a different company, sustained when he fell from a ladder that a DAL employee left open and unsupervised during the course of DAL's contracted-for work. That provision is not, as the majority contends, limited to only those acts or omissions that occur as DAL employees actively perform their work. Therefore, contrary to the majority, I would reverse the Appellate Division's order, grant summary judgment to Rockefeller and JRM on their cross-claim for contractual indemnification against DAL, and answer the certified question in the negative. I dissent.
I.
A.
The relevant facts, and the text of the applicable contractual provisions, are undisputed. DiBrino was injured while working on an office construction on the fifth floor of a building owned by defendant Rockefeller. Rockefeller hired defendant JRM as general contractor for the construction. In turn, JRM hired defendant DAL as a subcontractor for electrical work, and nonparty Jacobson & Co., Inc. (Jacobson) as a subcontractor for drywall and ceiling work. On the day his injury occurred, DiBrino, a Jacobson employee, was measuring the ceiling in the office's pantry room in order to install beams. After DiBrino finished marking the ceiling in preparation for the installation, he moved both the Jacobson-owned scaffold and ladder he was using to another area in the building and took a lunch break. During DiBrino's break, another Jacobson employee, Michael Tighe, asked him to check a discrepancy in the ceiling measurements. When DiBrino returned to the pantry room, he saw that a different ladder had been set up and left open, and he used it to check his measurements. After using the ladder for around 15 minutes, DiBrino felt it wobble. He tried to jump off the ladder before it collapsed, but his foot got caught, causing him to fall and suffer serious injuries after a pair of snips in his toolbelt punctured his abdomen. DiBrino later learned that DAL owned the ladder.
Before starting its electrical work, DAL entered into a master subcontractor agreement with Rockefeller and JRM. The agreement contains three separate indemnification provisions. The first provision, Article 6.10.6, requires DAL to indemnify Rockefeller and JRM for, as relevant here, "all [c]laims, damages, and the payment of all fines . . . as a result of [DAL]'s performance of the Work related in any way to . . . deficiencies in the planning and execution of the Work for which [DAL] is responsible [*7]under this Agreement." The second provision, Article 10.1, requires indemnification for, among other things, any claims or damages "arising out of Work by [DAL]."
The third provision, Article 12.2.1, is part of an addendum to the agreement, titled "MLB Pass-through provisions" (the Addendum). The introduction to the Addendum states that it "shall amend, add to, supplement, modify, and/or replace" provisions of the agreement. It further provides that "[i]n the event of any conflict between the terms of this Addendum and the [agreement], this Addendum shall take precedence." Article 12.2.1 is broader than Articles 6.10.6 and 10.1, stating, as relevant here:
"To the fullest extent permitted by law, [DAL] hereby agrees to indemnify [Rockefeller and JRM] against . . . any and all liabilities, claims, suits, demands, damages, judgments, costs, fines, penalties, interest, and expenses . . . arising out of, resulting from or in any way related, directly or indirectly, to the following:
"(a) any acts or omissions, breach of the terms, conditions, representations, warranties, or obligations under this Agreement . . . including, without limitation, (i) injuries to . . . any Subcontractor's employees" (emphasis added).
B.
After the accident, DiBrino and his spouse sued Rockefeller, JRM, DAL, and a second general contractor, Turner Construction Company,[FN1] alleging violations of Labor Law §§ 200, 240 (1), and 241 (6), and raising common law negligence and loss of spousal services claims. Rockefeller and JRM jointly answered the DiBrinos' complaint and asserted cross claims against DAL for contractual indemnification, common law indemnification, common law contribution, and breach of contract. DAL also answered and asserted cross claims against Rockefeller and JRM for common law indemnification and common law contribution.
DiBrino and various witnesses were deposed during the litigation. DiBrino testified that he initially did not know who owned the ladder he fell from, but he was aware that it was not a Jacobson ladder. He stated that he did not notice anything about the ladder that would have made it unsafe and did not know why it collapsed. Photographs of the ladder entered into the record depict a bent non-stepping rung, and blue tape covering other rungs. A DAL employee had placed that tape on the ladder.
Richard Ryan, a DAL foreperson, testified that DAL had an unwritten policy requiring any employee who uses a ladder to take it down and put it away when finished with a task. However, he explained that the policy did not apply when an employee only stopped working to take a lunch break. Ryan stated that the policy was intended to address concerns that a non-employee might use a DAL ladder "incorrectly" and get hurt. Ryan also testified that, as foreperson, his responsibilities included checking DAL's ladders every day, and if any stepping or non-stepping rung looked "out of sort," he would take it "right out of service" and put printer's tape around it, writing "do not use" on the tape. When presented with the photographs of the ladder in question, Ryan conceded that he "probably would" take the ladder out of service because of the bent non-stepping rung.
DAL senior project manager George Abdilla affirmed that, as a general rule, DAL did not permit employees from other companies or trades to use its tools. In the rare case where a non-DAL employee was in desperate need to use DAL's tools, a DAL foreperson would first require that they sign a hold harmless authorization. However, Abdilla admitted that DAL could not fully enforce this policy, given that employees leave their tools out in the open when they take breaks on the job. Thus, the policy was "only" enforced to the extent that DAL employees were supposed to say "no" when an employee from another company or trade directly asked them to borrow a tool. After viewing photographs of the ladder that caused [*8]DiBrino's injuries, Abdilla testified that, without having personally inspected it, he could only conclude that he would "get rid of [it]," because it did not look like it should stay in service.
Jacobson employee Tighe also testified. He stated that he did not see DiBrino fall because he was looking at drawings at the moment of the accident. He also explained that, although no employee is supposed to use a ladder that belongs to another employer, "everybody does," because "[i]f the ladder's there, you just grab it."
The parties filed respective motions for summary judgment. The DiBrinos moved for summary judgment solely on their Labor Law § 240 (1) claim. Rockefeller and JRM opposed and cross-moved for summary judgment on all of the DiBrinos' Labor Law claims. DAL similarly moved for summary judgment on the DiBrinos' Labor Law claims, in addition to their common law negligence claims. DAL also sought dismissal of Rockefeller's and JRM's cross claims against it. Rockefeller and JRM cross-moved for summary judgment on their cross claims against DAL.
Supreme Court partially granted summary judgment to each party. As relevant to this appeal, Supreme Court concluded that under the master subcontractor agreement, DAL agreed to indemnify Rockefeller and JRM for all claims and damages that resulted from DAL's "performance of the work . . . to the extent caused by the conduct or failure to act by [DAL]." Supreme Court observed that it was "uncontroverted that [DiBrino] was using DAL's ladder at the time of the accident," and it therefore rejected DAL's assertion that "the accident did not arise out of its contracted work performed under the master subcontractor agreement." Accordingly, Supreme Court granted summary judgment to Rockefeller and JRM on their cross claim for contractual indemnification against DAL.
Rockefeller, JRM, and DAL appealed. A divided Appellate Division modified Supreme Court's order by, as relevant here, granting DAL summary judgment and dismissing Rockefeller's and JRM's contractual indemnification cross claim and denying Rockefeller and JRM summary judgment on that claim (230 AD3d 127, 137 [1st Dept 2024]). The Appellate Division certified to this Court the question of whether its decision was correct, and the majority now answers that question in the affirmative (see majority op at 17). To reach that answer, the majority misconstrues the language of Article 12.2.1 in the Addendum, ignoring that it requires DAL indemnify Rockefeller and JRM for "any acts or omissions," "without limitation," that cause injuries to another subcontractor's employee. The Appellate Division wrongly concluded that the indemnification language applies only when an injury is to a DAL employee or is the "result of a DAL employee's performance or completion of a task that DAL was contractually obligated to do" (230 AD3d at 136), and the majority adopts the same reading. However, the plain language of Article 12.2.1 is broader, and accordingly, the certified question should be answered in the negative.
II.
The applicable legal standards are well settled. "Summary judgment is a drastic remedy, to be granted only where the moving party has tender[ed] sufficient evidence to demonstrate the absence of any material issues of fact and then only if, upon the moving party's meeting of this burden, the non-moving party fails to establish the existence of material issues of fact which require a trial of the action" (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012] [internal quotation marks and citations omitted]). The standard favors the nonmovant because "facts must be viewed in the light most favorable to the non-moving party" (id. at 503 [internal quotation marks omitted]), and a court may grant summary judgment only "if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of" the movant (CPLR 3212 [b]).
As to the issue on appeal, "[a] party is entitled to full contractual indemnification provided that the 'intention to indemnify can be clearly implied from the language and purposes of the entire agreement and the surrounding facts and circumstances' " (Drzewinski v Atlantic Scaffold & Ladder Co., 70 NY2d 774, 777 [1987], quoting Margolin v New York Life Ins. Co., 32 NY2d 149, 153 [1973]). An indemnification provision "must be strictly construed to avoid reading into it a duty which the parties did not intend to be [*9]assumed" (Hooper Assoc. v AGS Computers, 74 NY2d 487, 491 [1989]). The Court has upheld broad indemnification provisions, holding that "[w]hen the intent is clear, an indemnification agreement will be enforced even if it provides indemnity for one's own or a third party's negligence" (Bradley v Earl B. Feiden, Inc., 8 NY3d 265, 275 [2007]). More generally, "[i]t is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed" (Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995] [internal citations and quotation marks omitted]). Thus, clear, complete writings should generally be enforced according to their terms (id. [internal citations and quotation marks omitted])
III.
Article 12.2.1 of the Addendum establishes Rockefeller's and JRM's entitlement to summary judgment on their contractual indemnification cross claim against DAL. That provision, by its plain terms, obligates DAL to indemnify Rockefeller and JRM for all claims and damages "in any way related, directly or indirectly" to any of DAL's "acts or omissions" under the agreement. As part of DAL's electrical work under the agreement, its employee left a DAL-owned ladder open and unsupervised, and at that point—while DAL was in the middle of performing its work—DiBrino injured himself using that ladder. DAL's handling of its equipment, and the safety precautions it took while discharging its contractual duties, was a necessary component of its work under the agreement. Indeed, under Article 6.8, DAL agreed to "at all times keep the Project's work area and premises free from . . . unsafe conditions resulting from the Work." Further, under Article 6.10.1, DAL agreed to "take all necessary safety precautions with respect to performance of the Work." DiBrino's use of DAL's ladder is therefore at least "indirectly related" to DAL's completion of its work for Rockefeller and JRM, thereby bringing it within Article 12.2.1's ambit.
Every subsection in Article 12.2.1 contains similarly expansive indemnification requirements, evincing the parties' specific intent to impose broad financial liability on DAL should issues arise during its performance of its work. Subsection (b) requires DAL to indemnify Rockefeller and JRM for "all amounts payable under worker's compensation or similar [l]aws . . . in connection with, or arising out of, or resulting from, acts or omissions of [DAL] or any of their respective agents or employees." Subsection (c) covers DAL's "failure to perform obligations arising from its respective employment relationship with its employees," including, "without limitation," claims related to wages, benefits, or the failure to pay taxes. Subsection (d) obligates DAL to indemnify Rockefeller and JRM for "any claim asserted, or lien or notice of lien filed," by any person against Rockefeller or JRM "in connection with the Project by reason of the failure of [DAL] to comply with any obligation . . . under this Agreement." Under subsection (e), DAL agrees to indemnify Rockefeller and JRM for all taxes "by reason of the performance of the Work." Subsection (f) makes DAL responsible for "all pension, welfare, vacation annuity and other union benefit contributions payable under or in connection with labor agreements with respect to all [DAL employees] engaged in the Work to be performed and furnished under this Agreement." Lastly, subsection (g) required DAL to indemnify Rockefeller and JRM for "the negligence or willful misconduct or negligent acts or omissions of [DAL], or [its] agents, contractors, subcontractors, servants or employees."
Thus, the preface to Article 12.2.1 and each subsection listed therein broadly covers a wide range of DAL's acts and omissions, indicating that the bargained-for indemnification provision encompass more than the actions that DAL employees must take to complete their work. Notably, in contrast to Articles 6.10.6 and 10.1, Article 12.2.1 (a) does not contain language limiting DAL's liability to claims and damages "arising out of," or "as a result of [DAL's] performance of" its work. That language—present in Articles 6.10.6 and 10.1—requires a stronger nexus between a claim and DAL's agreed-upon work for Rockefeller and JRM. Indeed, this Court has interpreted "arising out of" in contractual language to " 'mean originating from, incident to, or having connection with' " (see e.g. Worth Constr. Co., Inc. v Admiral Ins. Co., 10 NY3d 411, 415 [2008], quoting Maroney v New York Cent. Mut. Fire Ins. Co., 5 NY3d 467, 472 [2005]). However, Article 12.2.1 (a) specifies that DAL is liable for all claims and damages even indirectly related to [*10]any "acts or omissions" under the agreement, including those acts or omissions that do not directly arise out of DAL's work.
Moreover, when a provision is intended to cover only the performance or completion of DAL's work, it says so expressly. Notably, Article 12.2.1 (f) refers to "[w]ork to be performed and furnished under this Agreement." If the phrase "under this Agreement" by itself, as used in subsection (a), only encompasses DAL's completion of its work, it would have been unnecessary to add the additional language used in subsection (f). Similarly, Article 6.10.6 refers to "performance of the Work for which [DAL] is responsible under this Agreement," and Article 10.1 refers to damage to property including "the Work," and indemnification for claims and damages caused, or alleged to be caused, by any act or omission "arising out of [DALs or its employee's] Work." In each instance, the narrower language evinces an intent to limit the indemnification discussed in that particular provision to the scope of DAL's performance of its work. The absence of such language in Article 12.2.1 (a) is, therefore, meaningful.
IV.
Article 12.2.1, while broad, is not without limits. For example, DAL would not be obligated to indemnify Rockefeller and JRM if its employee had safely closed and stored its ladder, and a non-DAL employee broke into DAL's storage, took DAL's ladder, and was injured while using it. That is far from what happened here. Instead, DAL's employee left the ladder unattended on the work floor, where anyone else could use it. This unauthorized type of use was well-known to DAL, as its managers testified that they were aware that non-employees might use their tools if left out, and that in some circumstances, such use could lead to injury. For that very reason, DAL adopted a policy intended to prevent non-DAL employees from using DAL's tools. Nevertheless, as Ryan and Abdilla conceded, DAL did not fully enforce that policy, and its employees regularly left tools out when they took work breaks. Similarly, Tighe testified that employees inevitably use tools from other trades when they are left unattended. Based on this undisputed evidence, the use of another employer's tools when they are left out and unattended was commonplace at the construction site where DAL contracted to perform its work. Thus, DiBrino's use of DAL's ladder when it was left out and unattended, and the injuries resulting from his fall, are encompassed under DAL's agreement with Rockefeller and JRM.
The majority's assertion that my interpretation of Article 12.2.1 is "unbounded" therefore falls flat (majority op at 12). The boundary of Article 12.2.1's reach lies in its requirement that an act or omission occur "under this Agreement." For the above reasons, a non-employee using DAL's ladder after an employee leaves it out and unsupervised falls within DAL's work "under this Agreement," because it was an anticipated and commonplace part of that work. By contrast, there is no record evidence that DAL would anticipate that a non-employee would break into their storage to take and use one of its ladders, or that such thefts routinely take place. There is no reason, then, to believe that Rockefeller, JRM, or DAL considered theft and use of a stowed-away ladder an aspect of DAL's work "under this Agreement" when they contracted.
Additionally, the majority's claim that reading Article 12.2.1 to cover DiBrino's injury would "render the other contractual indemnification provisions superfluous" fails on its own terms (majority op at 10). The majority concedes that Article 12.2.1 "brings additional claims within the sweep of claims that trigger DAL's contractual duty to indemnify," without explaining how, under its own reading, the provision does not render the other indemnification provisions superfluous (id.). Even more critically, the contracting parties anticipated that terms in the master subcontractor agreement and the Addendum might conflict or vary in breadth, and they expressly agreed that, in such circumstances, the terms of the Addendum apply. The Addendum may even "replace" terms in the master subcontractor agreement. Thus, the majority's reliance on a general canon of construction against reading a contract in a manner that renders a provision without force or effect is misplaced in this particular dispute (see id.). Instead, it is obvious that the parties [*11]intended to supplement the narrower indemnification provisions in the master subcontractor agreement with the broader provision in the Addendum, and the majority's unwillingness to read the contract accordingly ignores this intent. Furthermore, while the majority is correct that Article 12.2.1 incorporates provisions of the master subcontractor agreement (see id. at 9), the introductory section of the Addendum makes clear that it does not incorporate the provisions of the master subcontractor agreement that it is meant to replace; nor does it incorporate limitations from the master subcontractor agreement that it is meant to supplement.
Contrary to the majority's contention, the Addendum's introductory section provides sufficient guidance for how to interpret the relationship between Article 12.2.1 and the other indemnification provisions (see majority op at 12). According to its plain terms, when provisions of the master subcontractor agreement and the Addendum directly conflict, the latter replaces the former. Similarly, when a provision of the Addendum covers broader ground than its analogous provision from the master subcontractor agreement, it has supplemented that provision. In light of the Addendum's instructions for interpretation, it is clear that the parties intended for Article 12.2.1 to provide additional circumstances where DAL would be liable to indemnify Rockefeller and JRM.[FN2]
V.
A close reading of the various indemnification provisions in the parties' agreement illustrates quite clearly that Article 12.2.1 encompasses the DAL employee's act of leaving the ladder open and unattended during the course of their work, which ultimately resulted in DiBrino's injuries.[FN3] DAL's handling (or mishandling) of its equipment falls under its agreement with Rockefeller and JRM. Rockefeller and JRM therefore established, on this record, that DiBrino's accident was at least "indirectly" related to DAL's acts or omissions under the agreement, even if it did not "arise out of" DAL's work. Thus, Supreme Court properly granted Rockefeller's and JRM's motion for summary judgment motion with respect to their contractual indemnification cross-claim.
I dissent.
Order insofar as appealed from affirmed, with costs, and certified question answered in the affirmative. Opinion by Chief Judge Wilson. Judges Garcia, Singas, Cannataro and Halligan concur. Judge Rivera dissents in an opinion, in which Judge Troutman concurs.
Decided December 18, 2025

Footnotes

Footnote 1: Mr. Dibrino did not appeal from the Appellate Division order and his claims are not at issue here.

Footnote 2: On this appeal, Rockefeller and JRM challenge only the dismissal of their cross-claim against DAL and do not challenge the award of partial summary judgment to plaintiffs as against them.

Footnote 1: All claims against Turner Construction Company were eventually discontinued.

Footnote 2: Rockefeller's and JRM's argument that DAL must indemnify them under any of the three indemnification provisions has no bearing on this analysis. That argument, stated differently, is that the plain language of even the narrower indemnification provisions reflects the parties' intent to hold DAL liable for circumstances such as DiBrino's accident. It does not preclude Rockefeller and JRM from making the alternative argument, as they did here, that even if we disagree with their reading of the indemnification provisions in the master services agreement, the broader language in Article 12.2.1 renders DAL liable. 

Footnote 3: Given my conclusion that DAL must indemnify Rockefeller and JRM under the plain language of Article 12.2.1, I have no occasion to address whether Rockefeller and JRM preserved their alternative argument that DAL must indemnify them because it owed DiBrino a duty of care based on having "launched a force or instrument of harm" by leaving a defective ladder unattended, and if they have, consider its merits (see Espinal v Melville Snow Contrs., 98 NY2d 136, 141 [2002]; Church v Callanan Indus., 99 NY2d 104, 111 [2002]; see also 230 AD3d at 141-142 [Mendez and Gesmer, JJ., dissenting]).